## The People of the State of Illinois, Defendant in Error, v. George P. Powers, Plaintiff in Error.

### Gen. No. 6,227.

1. APPEAL AND ERROR, § 963*—*how record 'may not be impeached.* The record of the trial court imparts verity and may not be impeached by affidavits on appeal.

2. APPEAL AND ERROR, § 930*—*when record may be amended.* Where a record filed is incorrect, or omits necessary matter supposed to have occurred in the trial court, the record can only be corrected by application to the court below in term time, and the trial court has jurisdiction to hear and determine the matter at a later term, if there exists anything to amend the record by.

3. APPEAL AND ERROR, § 1345*—*when presumed that bill of exceptions presented to trial judge before expiration of judgment term.* It will be presumed that a bill of exceptions signed by a trial judge after the expiration of the judgment term was presented to him before the expiration of such term, where there is nothing in the record on appeal to show when it was presented to him and he did not follow the customary practice of indorsing upon the bill the fact and date of its presentation to him for signature.

4. APPEAL AND ERROR, § 831*—*when bill of exceptions may be presented to trial judge.* A bill of exceptions may be presented to the trial judge at any time during the term at which the judgment was rendered without any previous order permitting the same to be so presented and filed.

5. APPEAL AND ERROR, § 839*—*when right to file bill of exceptions expires.* If a bill of exceptions is not presented during the term and no order is granted fixing the time for its presentation beyond the term, the right to file such a bill of exceptions expires with the term.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The People v. Powers, 200 Ill. App. 536.

6. APPEAL AND ERROR, § 846*—*when judge may receive and sign bill of exceptions after term.* Where a bill of exceptions is not presented within the term, the judge may not thereafter receive and sign such a bill except by consent of parties, and the order of the court, by such consent, in term time extending the time.

7. INTOXICATING LIQUORS, § 151*—*when evidence insufficient to show that defendant keeper of place where liquors sold.* On a prosecution for the sale of intoxicating liquor, where it appeared that defendant had sold the premises in which it was alleged that the liquor was sold to his wife, and that the premises had been rented to another person to be used for the sale of soft drinks, but that defendant had a desk in the front part of a room on the premises, evidence *held* insufficient to establish that defendant was the keeper of a place in which intoxicating liquors were sold, so as to authorize its abatement as a nuisance.

8. CRIMINAL LAW, § 594*—*when judgment reversed as a whole.* A judgment of conviction for selling intoxicating liquor in antisaloon territory under one count and of being the keeper of a place which is a nuisance under another count must be reversed as a whole, where the defendant is not guilty under the latter count.

Error to the County Court of Boone county; the Hon. WILLIAM C. DeWOLF, Judge, presiding. Heard in this court at the April term, 1916. Reversed and remanded. Opinion filed August 10, 1916.

WILLIAM L. PIERCE and ALEXANDER J. STROM, for plaintiff in error.

PATRICK H. O'DONNELL, for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

George P. Powers was convicted under the first count of an information charging him with the sale of intoxicating liquor in violation of the anti-saloon territory act (J. & A. ¶ 4637 *et seq.*), and under the eighth count charging him with being a keeper of a place which was a nuisance under the same act. He was sentenced to imprisonment and a fine under each count and there was a judgment for the abatement of the al-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

leged nuisance. He has sued out this writ of error to review said judgment.

In this court the State's Attorney entered a motion to strike the bill of exceptions from the record, and accompanied said motion by a supplemental record, duly certified, showing the order for the adjournment of the term at which said conviction was had in the court below. We took that motion with the case. Defendant in error filed affidavits setting up his version of the facts in the court below concerning the presentation and signing of said bill of exceptions. The State's Attorney moved to strike said affidavits from the files and we took that motion with the case. The State's Attorney then filed counter-affidavits tending to show an entirely different state of facts concerning the presentation and signing of said bill of exceptions in the court below. We have, therefore, to determine: (1) Whether the affidavits shall or shall not be considered here; and (2) whether the bill of exceptions shall be stricken from the files.

By many decisions it has been settled that in a reviewing tribunal in this State the record of the court below imports verity and cannot be contradicted by affidavits, nor can any deficiency therein be supplied by affidavits filed in such reviewing court. If the record filed is incorrect, or omits necessary matter supposed to have occurred in the court below, the record can only be corrected by an application to the court below in term time, and the court below has jurisdiction to hear and determine the matter at a later term, if there exists anything in the record to amend by. These rules are stated and applied in *Wilder v. House*, 40 Ill. 92; *People v. Jameson*, 40 Ill. 93; *Herrington v. McCollum*, 73 Ill. 476; *Roche v. Beldam*, 119 Ill. 320; *Wisconsin Cent. R. Co. v. Wieczorek*, 151 Ill. 579; *West Chicago St. R. Co. v. Morrison, Adams & Allen Co.*, 160 Ill. 288. The reason for these rules is thus stated

in *Wisconsin Cent. R. Co. v. Wieczorek, supra:* "The judgment of courts of review must always be formed upon the record, and from that alone. If they should assume to cure mistakes or omissions of the parties or counsel in the court below, by supplying matters omitted, inadvertently or otherwise, from the record, they might in like manner change the record in other respects, to the detriment of parties litigant. To do so would introduce the greatest uncertainty and confusion, be the exercise of a power with which they are not vested, and destroy the security and certainty which should inhere in judicial proceedings." It follows that the affidavits filed by the plaintiff in error, and also those filed by the State's Attorney must be stricken from the files. But this does not include the supplemental record filed by the State's Attorney, which we permit to stand.

The record is certified to contain all the orders of record in the court below in the cause in question, and the supplemental record shows when the term ended. It therefore appears from the record that the judgment in this cause was entered on December 6, 1915; that no application for leave to present a bill of exceptions or to fix a time within which a bill of exceptions might be presented was ever made to the court in this cause; that the term adjourned on December 7, 1915, and that the bill of exceptions was approved by the State's Attorney under date of December 9th, and was signed by the judge under date of December 9th, and was filed by the clerk on December 9, 1915; and the statute shows that the next term of said County Court began on the second Monday of December, 1915, which was December 13th. This bill of exceptions was therefore signed and filed in vacation. It is well settled that a bill of exceptions may be presented to the trial judge at any time during the term at which the judgment was rendered without any previous order

permitting the same to be so presented or filed; but if it is not presented during the term and no order is granted fixing the time for its presentation beyond the term, the right to present a bill of exceptions expires with the term, and if not presented within the term the judge may not thereafter receive and sign any bill of exceptions except by consent of the parties, and the order of the court, by such consent, in term time extending the time. In *Underwood v. Hossack,* 40 Ill. 98, it was held that where a trial judge had signed a bill of exceptions, the court of review would presume that he would not have done so unless it had been presented to him in proper time, and that the mere fact that it was not filed in proper time does not rebut that presumption. This was again held in *Goodrich v. Cook,* 81 Ill. 41, and in *Village of Hyde Park v. Dunham,* 85 Ill. 569. *Underwood v. Hossack, supra,* is cited with approval in *Magill v. Brown,* 98 Ill. 235; *Hawes v. People,* 129 Ill. 123; and in *Olds v. North Chicago St. R. Co.,* 165 Ill. 472, where the language of *Underwood v. Hossack* is quoted as follows: "The judge having signed the bill of exceptions, we will presume that he would not have done so, unless it had been presented to him in proper time." That case is also cited in *Conductors' Mut. Aid & Benefit Ass'n v. Leonard,* 166 Ill. 154; *Pieser v. Minkota Milling Co.,* 222 Ill. 139; *T. E. Hill Co. v. United States Fidelity & Guaranty Co.,* 250 Ill. 243; and *People v. Rosenwald,* 266 Ill. 548; though in some of these cases *Underwood v. Hossack, supra,* was treated as if it had affirmatively appeared that the bill of exceptions was presented to the judge in time. The Appellate Courts of this State have followed *Underwood v. Hossack* in holding to the presumption that the bill of exceptions was presented in apt time because the trial judge signed it. The fourth district held this in *Morrison v. People,* 52 Ill. App. 482; the first district in *Banker v. Miller,* 148 Ill. App. 182; and *Mangold v. King,* 184 Ill. App. 50; and

this court in *Yunker v. Marshall*, 65 Ill. App. 667. We
have not found any case where the principle announced
in *Underwood v. Hossack, supra*, has been overruled.
We therefore consider it decisive in this case, and we
therefore presume that this bill of exceptions was pre-
sented to the trial judge before the end of the judg-
ment term, from the fact that he afterwards signed it,
there being in the record nothing to show when it was
presented to the trial judge, and he not having fol-
lowed the common and approved practice of indorsing
upon the bill the fact and date of its presentation to
him for signature. The motion to strike the bill of
exceptions from the files is therefore denied.

The proofs for the People showed that the place of
business here involved, No. 423 South State street in
the City of Belvidere, was formerly owned and oper-
ated as a saloon by Powers, and had a sign in front
with the name of Powers upon it; that that locality
became anti-saloon territory on May 7, 1914, and so
remained up to the time of the filing of the information
in this cause, which seems to have been October 27 or
28, 1915. Ettner, a patrolman, testified that he had
seen Powers open his place of business in the mornings
and close it in the evenings in May, June and July, and
had seen Powers go in and take off his coat and hat
and walk around there. Avery, a detective, testified
that in his presence on December 22 or 23, 1914,
Powers sold Youngs, another detective, a bottle of
liquid, a part of which was afterwards analyzed and
found to contain ninety-three per cent. alcohol. Avery
also testified that on December 23, 1914, he bought a
glass of cider of Powers at that place which he con-
sidered hard cider and an intoxicating liquor, although
he drank it and it did not intoxicate him to the slightest
extent. Peterson testified that on September 17, 1915,
he bought and paid for lager beer at that place from
one Sharp. Moore, a detective, testified that he and
Behling, another detective, obtained whisky from

Sharp at that place on October 1, 1915, and that later that day Behling sent one Blank into this place on that business and he afterwards came out and delivered to Behling a pint of whisky. Behling testified to the same facts. He lived in Bloomington, and testified that he reached Belvidere on September 22, 1915, and left it on or about October 1, 1915, and that he saw Powers in that place of business once selling a cigar. Blank testified to the occasion of his buying a bottle and taking it outside to Moore, the detective. Johansen, a policeman, testified that he had seen Powers around that place during the year 1915 quite often, and practically every day, unless he was out of town, and he had seen Powers back of his desk or walking back and forth, and had seen him take off his coat and hat and walk back of the counter or bar, and saw him there, as a rule, from seven to six; and that on a certain Saturday in 1915 he counted the number of persons going in from 7:00 a. m. until after ten o'clock at night and counted 367 persons. He had seen probably 200 to 250 people going in on other days, and this occurred for about a year. On cross-examination he said that probably double that number had gone into a certain grocery store that came under his observation during one day. The chief of police said he had seen from 50 to 100 people per day going into that place between May 7, 1914, and October 28, 1915. The defense proved that at the time this became anti-saloon territory Powers owned the building, which was a two-story brick; that the upstairs part was unoccupied; that immediately upon its becoming anti-saloon territory he leased the premises to one Clark for a soft drink parlor, or a place where ice cream and soft drinks and cigars were sold, at a rental of $35 per month, and that he received that rent and had no connection with the business carried on in that room back of the screen, and that he never sold any intoxicating liquor there or saw any

sold or knew of any being sold after he leased the place to Clark. He testified that in the front of the building between the screen which had led to the former saloon and the front door, he had a desk and a safe and one or more chairs, and that he kept that by an arrangement with Clark as his private office. Clark had been a bartender for him when he kept the saloon. Sharp and another man worked for Clark after the latter became tenant, and Powers testified they had never worked for him. Powers testified that his principal business was the management of two race horses; that in the fore part of the season of 1915 he was training these horses at the fair grounds at Belvidere, a mile and a half distant from this office, and that he went daily to the fair ground and spent the day there except Sundays; that he kept in his office certain articles which he used in connection with the training of his horses and each morning he went there early and opened the front door, to which he had a key, and took out these articles and then left the building and went to the fair grounds, and returned again at night and left the articles in the building; and that he was not in the habit of being in the ice cream and soft drink parlor run by Clark. He testified also that he transacted certain business at that place in reference to a farm which he managed. Powers testified that in July he went with his horses to Iowa and returned to Belvidere for the fair week there the first part of September, and then went to Wisconsin and Minnesota with his horses and did not return until about the middle of October, and that he was not in Belvidere, nor within six hundred miles of there, at the time when the two witnesses above referred to testified to seeing him in that place of business. He was corroborated as to his action in the horse business and to the time he put in at the fair grounds in Belvidere, and as to the times of his absence in Iowa, Wis-

consin and Minnesota by various witnesses. He also testified that on November 24, 1914, he conveyed these premises to his wife as security for a loan she made to him of $6,000, and that the premises were then worth $8,000, and that he thereafter continued to collect the rent for her and to cause the premises to be kept in repair and bills for light and heat to be paid; that on January 19, 1915, a written lease to Clark was executed, which he signed as agent for his wife, and under which Clark thereafter continued to pay rent at $35 per month. The lease contained provisions that no intoxicating liquors should be sold there during the term of the lease, and that the tenant should be entitled to an extension of the lease unless said town became saloon territory before the 1st of May, 1916, in which case there should be no extension. Except one matter to be hereafter stated, there is no evidence that the oral lease to Clark, the deed from Powers to his wife, and the written lease by Powers as agent of his wife to Clark were not all genuine, bona fide transactions, and the rent paid from month to month as testified to by Powers, except the fact that his name was on the front of the building, that he had his office in the front between the door and partition, or screen; that he was seen there from time to time, and that two witnesses say he sold them a bottle of whisky in December, 1914; and one of these witnesses says that he bought of Powers a bottle of hard cider at about the same time. The proof was that the cigar case operated by the tenant stood between the front door and the partition, and that Powers sometimes sold a cigar therefrom when no one else was there to wait on a customer; but Powers testified that he had no authority to do that. There was no proof how many customers there would be likely to be on Saturday or any other day of the week in a place strictly devoted to ice cream, soft drinks and cigars, and the jury were not warranted in inferring from anything in the evidence that the number of per-

sons attending that place was evidence that liquor was sold there. Certainly the officer who counted the men going in all day could have taken the names of various people who went in and they could have been called as witnesses and it could have been ascertained from them whether they drank, or saw others drink, intoxicating liquor in that place, and not have left the matter to the conjecture of the jury; or, if in such a place as Belvidere, no shop of that kind which did not sell intoxicating liquor had any such patronage, that fact also could have been shown. It may be that under this evidence a conviction under the first count could be sustained on the ground that the jury and the trial judge believed the witnesses who testified that Powers sold a bottle of whisky in December, 1914; but it seems to us that the foregoing testimony does not establish that Powers was the keeper of the place and does not authorize a judgment shutting up and abating the place. The proof is all one way, that Clark is the tenant and that Sharp and another man are his clerks, and that Clark professes to run a place where he sells soft drinks, ice cream and cigars, and we feel that on this proof his business should not be destroyed by a judgment to which Clark is not a party. It is true that we held in *Grom v. People*, 135 Ill. App. 453, and *Gaul v. People*, 136 Ill. App. 445, that we could affirm a conviction under one count of such an indictment and reverse the conviction under another count, but the Supreme Court reversed the latter judgment in *People v. Gaul*, 233 Ill. 630, and held that judgments under such an information must be affirmed or reversed as to all counts. If the conviction under the last count can be sustained, it can only be because of certain answers made by Powers on recross-examination just at the close of the evidence. He was asked if on or about April 30, 1915, he said to the mayor of the city: ''I own the building where I am and I don't want it closed.

I want to run it so I can sell cigars and soft drinks and I will not sell any liquor in violation of the law. If you close it up, I will get no revenue from it, but by selling cigars and soft drinks I can make $30 or $40 a month in it''; and he answered that he had a conversation something to that effect. He was then asked if he had another talk with the mayor on or about June 6, 1915, in which he said: ''That you would lock up the up-stairs of your building; that no liquor had been sold nor would there be any liquor sold as long as you had charge of it; that you would lock all doors going up-stairs and all doors except the front door.'' He answered thus: ''He asked me if they was selling liquor there and I told him they wasn't selling nothing at all. They was just selling soft drinks.'' Afterwards, he said he had a conversation something to that effect. The conversations with the mayor leading up to these statements were not given. The first one implies that he owned and was running the building. The second one, when considered with his answer, showed that he used the word ''they'' and not the word ''I.'' He said ''they'' were not selling liquor; ''they'' were selling soft drinks. When this language is considered in con-nection with all the other evidence in the case, we do not think it warrants the abating or closing up of a place of business which the proof shows that Clark is running under a written lease and for which he reg-ularly pays rent, since he is not a party to this suit and has had no opportunity to defend it. As we must affirm or reverse the judgment as to both counts, it is our duty to reverse the judgment and remand the cause for further proceedings.

*Reversed and remanded.*